IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRIS DERYLO, | ) | FILED: AUGUST 26, 2008 |
| | ) | 08CV4889 |
| Plaintiff, | ) | Case No.: JUDGE GUZMAN |
| | ) | MAGISTRATE JUDGE MASON |
| vs. | ) | BR |
| | ) | |
| HI-TIDE MEDIA, LLC and | ) | |
| | ) | **Trial by Jury Demanded** |
| MICHAEL KAKOYIANNIS, | ) | |
| | ) | |
| Individually, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

COMES NOW the Plaintiff, CHRIS DERYLO, by and through his attorney, Kristin M. Case of The Case Law Firm LLC, for his Complaint at Law against Defendants and states and alleges as follows:

### Introduction

1.  This action arises under the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 et seq., as amended (hereinafter "COBRA"), the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 et seq., and Illinois common law.

### Jurisdiction and Venue

2.  Jurisdiction is conferred on this Court by the above-named statutes, as well as by 28 U.S.C. § 1331 and § 1367. Venue of this action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391 (b) and (c).

**General Factual Allegations**

3. Plaintiff Chris Derylo ("Plaintiff") is a citizen of the United States and a resident of DuPage County, Illinois. Plaintiff was formerly employed by Hi-Tide Media as a Senior Editor. Plaintiff worked out of the company's office located at 211 East Grand Street, Suite 200 in Chicago, Cook County, Illinois.

4. Defendant Hi-Tide Media (hereinafter "Hi-Tide") is an Illinois Limited Liability Company doing business at its East Grand Street office in Chicago, Cook County, Illinois. Defendant is also an "Employer" as defined by ERISA and COBRA.

5. Defendant Michael Kakoyiannis (hereinafter "Kakoyiannis") is an individual and is and was at all relevant times President and CEO of Hi Tide Media, LLC.

6. Plaintiff began working for the company now known as Hi-Tide Media, in April 1996 in the post-production department. Throughout his employment he consistently met and/or exceeded Hi-Tide's expectations, and he was eventually promoted to Senior Editor.

7. On January 2, 2007, Plaintiff signed an employment agreement which included a guarantee of six months' severance pay in the event of a termination for no cause. Attached as Exhibit A is a copy of the Employment Agreement.

8. In consideration of the promises contained in the January 2, 2007 contract, Plaintiff continued to perform his duties and responsibilities in accordance with Defendant's expectations and also agreed to be bound by a six month non-compete restriction.

9. Plaintiff was terminated on June 15, 2007 due to a no-cause reduction-in-force.

10. As a result of his no cause termination, Plaintiff was entitled to six months' severance pay from Defendant Hi-Tide.

11. Plaintiff received his first 3.5 severance payments from Defendants, but has received no further payments since November 2007.

12. By terms of the agreement, Defendant Hi-Tide owes Plaintiff at least $35,937.14 more in severance payments.

13. On August 14, 2008, and pursuant to the Attorneys Fees in Wage Actions Act, Plaintiff sent Defendant a letter demanding the amounts owed. Attached as Exhibit B is a copy of this letter.

14. After being terminated from Hi-Tide, Plaintiff elected to continue his health insurance coverage through COBRA for himself and his family.

15. Plaintiff made payments of $1018.73 each on May 20th, June 20th, and July 21st of 2008 to cover the cost of this extended health insurance coverage.

16. Defendant Hi-Tide deposited each of Plaintiff's COBRA payments. However, Defendant failed to pay those premiums to the health insurance company.

17. On Saturday, August 23, 2008, while Plaintiff's wife was in the hospital for surgery related to breast cancer, Plaintiff learned that due to Hi-Tide's failure to pay health insurance premiums, his health insurance coverage had been terminated retroactively, effective June 1, 2008.

**COUNT I**
**VIOLATION OF THE CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT AGAINST DEFENDANT HI-TIDE**

18. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth in this Count I.

19. Plaintiff made timely COBRA payments. Despite this, Defendant Hi-Tide failed to continue Plaintiff's health insurance coverage as is required by COBRA.

20. As a direct and proximate result of said acts, Plaintiff has suffered loss of medical coverage for himself and his family, and has and will continue to incur substantial uncovered outstanding medical expenses.

WHEREFORE, Plaintiff respectfully requests that this court:

A. Order the Defendant to pay premiums to reinstate his medical coverage retroactively to June 1, 2008;

B. Award him reimbursement for all medical expenses resulting from his lack of coverage;

C. Award prejudgment interest;

D. Award him reasonable attorney's fees and costs incurred in this action; and

E. Award any further relief this Court deems just and appropriate.

**COUNT II**
**BREACH OF CONTRACT AGAINST DEFENDANT HI TIDE MEDIA**

21. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth in this Count II.

22. The parties entered into the Employment Agreement whereby Defendant agreed to provide Plaintiff with six months severance payments if he was terminated for no cause in exchange for Plaintiff's continued employment.

23. Plaintiff fully performed all of his obligations under the Agreement and was terminated as part of a reduction-in-force.

24. Defendant breached the agreement by failing to pay Plaintiff his entire six months' severance payment.

25. Plaintiff suffered damages as a proximate result of Defendant's breach.

WHEREFORE, Plaintiff respectfully requests that this court:

A. Award him damages in an amount of at least $35,937.14;

B. Award him reasonable attorneys fees and costs incurred in this matter;

C. Award any further relief this Court deems just and appropriate.

## COUNT III
## VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT
## AGAINST DEFENDANTS HI-TIDE MEDIA AND MICHAEL KAKOYIANNIS

26. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth in this Count III.

27. The balance of his severance payments owed to Plaintiff upon his termination constitutes final wages as defined by the Illinois Wage Payment and Collection Act.

28. Defendant Hi-Tide knowingly and willfully refused to pay to Plaintiff his final wages upon his separation.

29. As its President and CEO, and after a specific demand was made upon him, Defendant Kakoyiannis knowingly and willfully permitted Hi-Tide to refuse to pay the severance owed to Plaintiff.

30. As a proximate result of Defendants' refusals, Plaintiff has suffered damages as set forth herein and above.

WHEREFORE, Plaintiff respectfully requests that this court:

A. Award him damages in an amount of at least $35,937.14;

B. Award him reasonable attorneys fees and costs incurred in this matter;

C. Award any further relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

CHRIS DERYLO


By: /s/Kristin M. Case
His Attorney

Kristin M. Case
The Case Law Firm, LLC
150 North Michigan Avenue, Suite 2700
Chicago, Illinois 60601
Tel. (312) 920-0400
Fax (312) 920-0800
kcase@thecaselawfirm.com

# Employment Agreement

This Employment Agreement (this "<u>Agreement</u>") is dated as of January 2, 2007, and is made by and between Hi-Tide Media, LLC, an Illinois limited liability company (the "<u>Company</u>"), and Chris Derylo ("<u>Executive</u>").

W i t n e s s e t h:

WHEREAS, the Company desires to employ Executive, and Executive desires to be so employed, in each case, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the forgoing premises and the mutual covenants and promises contained herein, and for other good and valuable consideration, the Company and Executive hereby agree as follows:

1. **Agreement to Employ; No Conflicts**

   Upon the terms and subject to the conditions of this Agreement, the Company hereby agrees to employ Executive, and Executive hereby accepts employment with the Company. Executive represents and warrants that (<u>a</u>) Executive is entering into this Agreement voluntarily, and that Executive's employment hereunder and compliance with the terms and conditions hereof will not conflict with or result in the breach by Executive of any agreement to which Executive is a party or by which Executive may be bound; (<u>b</u>) Executive has not violated, and in connection with Executive's employment with the Company will not violate, any non-competition, non-solicitation or other similar covenant or agreement by which Executive is or may be bound; and (<u>c</u>) in connection with Executive's employment by the Company, Executive will not use any confidential or proprietary information Executive may have obtained in connection with Executive's employment with any prior employer.

2. **Term; Position and Responsibilities**

   2.1   *Term*.  Unless Executive's employment shall sooner terminate pursuant to Section 7, the Company shall employ Executive for a term commencing on the date hereof (the "<u>Commencement Date</u>") and ending on the second anniversary thereof (the "<u>Initial Term</u>"). Effective upon the expiration of the Initial Term and of each Additional Term (as defined below), Executive's employment hereunder shall be deemed to be automatically extended, upon the same terms and conditions, for an additional period of one year (each, an "<u>Additional Term</u>"), in each such case, commencing upon the expiration of the Initial Term or the then current Additional Term, as the case may be, unless, at least 60 days prior to the expiration of the Initial Term or such Additional Term, as the case may be, either party hereto shall have notified the other party thereto in writing that such extension shall not take effect. The period during which Executive is employed pursuant to this Agreement shall be referred to as the "<u>Employment Period</u>."

2.2   *Position and Responsibilities.*  During the Employment Period, Executive shall serve as Senior Editor of the Company.  Executive shall have such duties and responsibilities as are customarily assigned to individuals serving in such position, and such other duties consistent with Executive's position as the Company specifies from time to time. Executive shall devote all of Executive's skill, knowledge and business time to the conscientious performance of such duties and responsibilities, except for vacation time (as set forth in Section 6.2), absence for sickness or similar disability, and time spent performing services for any charitable, religious or community organizations, so long as such services do not materially interfere with the performance of Executive's duties hereunder.

3.   **Base Salary**

As compensation for the services to be performed by Executive during the Employment Period, the Company shall pay Executive a base salary at an annualized rate of $115,000, payable in periodic installments on the Company's regular payroll dates; provided, that the Company will increase Executive's base salary to $120,000 on January 1, 2008.  The Company shall review Executive's base salary annually during the Employment Period and, in its sole discretion, may increase (but not decrease) such base salary from time to time.  The annual base salary payable to Executive under this Section 3, as the same may be increased from time to time, shall hereinafter be referred to as the "Base Salary."

4.   **Incentive Compensation**

4.1   *Cash Bonus.*  For each fiscal year of the Company that ends during the Employment Period, Executive shall have an annual bonus opportunity (the "Bonus"), which shall be payable if 100% of the Performance Targets (as defined below) are achieved.  For purposes of this Agreement, "Performance Targets" means the budgeted sales goals for the Company for the applicable fiscal year (and/or any such goals for any fiscal quarter thereof), which shall be determined by the Company in its sole discretion on or before the end of the first quarter of the applicable fiscal year.  Any Bonus that becomes payable pursuant to this Section 4.1 shall be paid to Executive as soon as reasonably practicable following the Company's determination of whether the Performance Targets for the applicable fiscal year have been achieved and its calculation of the Bonus for such applicable fiscal year which, in each case, shall be no later than March 1 of the subsequent fiscal year.  Notwithstanding anything to the contrary contained in this Agreement or any applicable bonus plan, program or arrangement, and except as otherwise provided in Section 7, Executive shall be eligible to receive any such Bonus only if Executive is employed on the date bonuses are paid to employees of the Company generally.

#642131 v2\19047\001

4.2     *Equity Compensation.* During the Employment Period, Executive shall be eligible to participate in the equity compensation plan established by the Company on a basis that is commensurate with Executive's position and otherwise on terms and conditions set forth therein (as amended from time to time).

5.     **Employee Benefits**

Executive shall be eligible to participate in any defined contribution plan, any insurance program and any medical and other health benefit plan, in each case, sponsored by the Company for its employees on terms and conditions set forth in such programs and plans (as amended from time to time). During such period, Executive shall also be eligible to participate in the Company's Executive Management Long-Term Disability Plan on terms and conditions set forth in such plan (as amended from time to time).

6.     **Expenses; Vacation**

6.1     *Business Travel, Lodging, etc.* Subject to the Company's prior written approval, the Company shall reimburse Executive for reasonable travel, lodging, meal and other reasonable expenses incurred by Executive in connection with Executive's performance of services hereunder upon submission of evidence, satisfactory to the Company, of the incurrence and purpose of each such expense and otherwise in accordance with the Company's expense substantiation policy applicable to its employees as in effect from time to time.

6.2     *Vacation.* During the Employment Period, Executive shall be entitled 20 business days of paid vacation days per anniversary year, without carryover accumulation, which shall accrue in equal installments on a monthly basis.

7.     **Termination of Employment**

7.1     *Termination Due to Death or Disability.* In the event that Executive's employment hereunder terminates due to Executive's death or is terminated by the Company due to Executive's Disability, Executive shall be entitled to receive only the payments or benefits specified in Sections 7.6.1 and 7.6.3. For purposes of this Agreement, "Disability" shall mean a physical or mental disability that prevents the performance by Executive of Executive's duties hereunder for a continuous period of 90 days or longer, or for 120 days or more in any 12-month period.

7.2     *Termination by the Company.* The Company may terminate Executive's employment with the Company with or without Cause. "Cause" shall mean (a) any failure by Executive to substantially perform Executive's duties hereunder (other than any such breach or failure due to Executive's physical or mental illness); (b) any failure by Executive to cooperate,

#642131 v2 \19047 \001

3

if requested by the Company, with any investigation or inquiry into Executive's or the Company's business practices, whether internal or external, including, but not limited to, Executive's refusal to be deposed or to provide testimony at any trial or inquiry; (c) Executive's engaging in fraud, or misconduct that has caused or is reasonably expected to result in injury to the Company or any of its affiliates; (d) any breach by Executive of any fiduciary duty owed to the Company or any of its affiliates or shareholders; (e) Executive's conviction of, or entering a plea of guilty or nolo contendere to, a crime that constitutes a felony; and (f) any material breach by Executive of any of Executive's obligations hereunder or under any other written agreement or covenant with the Company or any of its affiliates. A termination for Cause shall include a determination by the Company following the termination of the Employment Period that circumstances existed during the Employment Period that would have justified a termination by the Company for Cause.

7.3  *Termination by Executive.*  Executive may terminate Executive's employment with the Company for any reason.

7.4  *Notice of Termination.*  Any termination of Executive's employment by the Company pursuant to Section 7.1 (other than in the event of Executive's death) or 7.2, or by Executive pursuant to Section 7.3, shall be communicated by a written Notice of Termination addressed to the other party to this Agreement. A "Notice of Termination" shall mean a notice stating that Executive's employment with the Company has been or will be terminated and the specific provisions of this Section 7 under which such termination is being effected.

7.5  *Date of Termination.*  As used in this Agreement, the term "Date of Termination" shall mean (a) if Executive's employment is terminated by Executive's death, the date of Executive's death; (b) if Executive's employment is terminated by Executive, 60 days after the Notice of Termination is given; and (c) if Executive's employment is terminated for any other reason, the latest of the date on which Notice of Termination is given, the date of termination specified in such notice and, if no such notice is given, 30 days after the date of termination of employment.

7.6  *Payments Upon Certain Terminations.*

7.6.1  *Termination Due to Death, Disability or Without Cause.*  If Executive's employment shall terminate due to Executive's death, or if the Company shall terminate Executive's employment due to Disability or without Cause, in each case, during the Employment Period, the Company shall pay to Executive (or, following Executive's death, Executive's beneficiaries):

(a) any accrued and unpaid Base Salary and vacation earned through the Date of Termination, which shall be paid on the tenth day after the Date of Termination (or, if such day is not a business day, the next business day after such day); *plus*

(b) as liquidated damages in respect of claims based on provisions of this Agreement and provided that Executive executes and delivers a general release of all claims in form and substance satisfactory to the Company (other than in the event of Executive's death), six months' Base Salary, which shall be paid in periodic installments on the Company's regular payroll dates.

7.6.2 *Termination For Any Other Reason.* If Executive's employment is terminated for any reason other than those specified in Section 7.6.1 during the Employment Period, the Company shall pay Executive on the tenth day after the Date of Termination or the expiration of the Employment Period, as the case may be (or, if such day is not a business day, the next business day after such day), any accrued and unpaid Base Salary and vacation earned through the Date of Termination.

7.6.3 *Effect of Termination on Other Plans and Programs.* In the event that Executive's employment with the Company is terminated for any reason, Executive shall be entitled to receive all amounts payable and benefits accrued under any otherwise applicable plan, policy, program or practice of the Company in which Executive was a participant immediately prior to the Date of Termination in accordance with the terms thereof; <u>provided</u>, that Executive shall not be entitled to receive any payments or benefits under any such plan, policy, program or practice providing any severance or incentive compensation and the provisions of this Section 7.6 shall supersede the provisions of any such plan, policy, program or practice.

7.7 *Resignation Upon Termination.* Effective as of any Date of Termination or otherwise as of the date of Executive's termination of employment with the Company, Executive shall resign, in writing, from <u>all positions</u> then held by Executive with the Company and its affiliates unless otherwise requested by the Company. Nothing in this paragraph shall be used to contest Executive's claim for unemployment benefits.

7.8

7.9 *Cessation of Professional Activity.* Notwithstanding anything to the contrary contained in this Agreement, if a disciplinary matter arises involving Executive, the Company may relieve Executive of Executive's duties and responsibilities described in Section 2.2 and require Executive to immediately cease all professional activity on behalf of the Company; <u>provided</u>, that Executive shall continue to receive the compensation and benefits specified herein. Upon delivery of a Notice of Termination by any party or a notice pursuant to Section

#642131 v2\19047\001

2.1, the Company may relieve Executive of Executive's responsibilities described in Section 2.2 and require Executive to immediately cease all professional activity on behalf of the Company.

**8.    Restrictive Covenants**

8.1   *Non-Competition.*   During the period beginning on the date hereof and ending six months after the termination of Executive's employment with the Company, Executive shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which Executive has knowledge at the time of Executive's termination of employment.

8.2   *Non-Solicitation of Employees.*   During the beginning on the date hereof and ending one year after the termination of Executive's employment with the Company (the "Restriction Period"), Executive shall not, directly or indirectly, for Executive's own account or for the account of any other natural person, partnership, limited liability company, association, corporation, company, trust, business trust, governmental authority or other entity (each, a "Person") in any jurisdiction in which the Company or any of its affiliates has commenced or has made plans to commence operations during the Employment Period, (a) solicit for employment, employ or otherwise interfere with the relationship of the Company or any of its affiliates with any natural person throughout the world who is or was employed by or otherwise engaged to perform services for the Company or any of its affiliates at any time during the Employment Period (in the case of any such activity during such time) or during the twelve month period preceding such solicitation, employment or interference (in the case of any such activity during the Restriction Period but after the date of Executive's termination of employment with the Company), other than any such solicitation or employment on behalf of the Company or any of its affiliates during the Employment Period; or (b) induce any employee of the Company or any of its affiliates to engage in any activity which Executive is prohibited from engaging in under any of this Section 8 or to terminate such employee's employment with the Company.

8.3   *Non-Solicitation of Business Relationships.*   During the Restriction Period, Executive shall not, directly or indirectly, for Executive's own account or for the account of any other Person, in any jurisdiction in which the Company or any of its affiliates has commenced or made plans to commence operations, solicit, interfere with, or otherwise attempt to establish any business relationship of a nature that is competitive with the business or relationship of the Company or any of its affiliates with any Person throughout the world which is or was a customer, client, distributor, supplier or vendor of the Company or any of its affiliates at any

time during the Employment Period (in the case of any such activity during such time) or during the twelve month period preceding such activity (in the case of any such activity after the Date of Termination or otherwise as of the date of Executive's termination of employment with the Company), other than any such activity on behalf of or at the request of the Company during the Employment Period on behalf of the Company or any of its affiliates. The only exception to this paragraph is the list of clients/accounts on schedule "A" which Executive will be allowed to engage in *Business Relationships* but only after the **Restrictive Covenant** *Non-Competition* six month period.

8.4 *Mutual Nondisparagement.* Executive agrees that Executive shall neither, directly or indirectly, engage in any conduct or make any statement disparaging or criticizing in any way the Company or any of its affiliates, or any of their personnel, nor engage in any other conduct or make any other statement that could be reasonably expected to impair the goodwill of the Company or any of its affiliates, the reputation of the Company or any of its affiliates, in each case, except to the extent required by law, and then only after consultation with the Company to the extent possible. The Company agrees it will use its reasonable efforts to ensure that the Company does not, directly or indirectly, engage in any conduct or make any statement disparaging or criticizing in any way Executive, or engage in any other conduct or make any other statement that could be reasonably expected to impair the business reputation of Executive, in each case, except to the extent required by law, and then only after consultation with Executive to the extent possible; provided, that any refusal by the Company to give a reference shall not be a breach of this provision.

8.5 *Return of Documents.* In the event of the termination of Executive's employment, Executive shall deliver to the Company (a) all property of each of the Company or any of its affiliates then in Executive's possession; and (b) all documents and data of any nature and in whatever medium of each of the Company or any of its affiliates, and Executive shall not take with Executive any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any Confidential Information.

8.6 *Confidentiality of Agreement.* The parties to this Agreement agree not to disclose its terms to any Person, other than their attorneys, accountants, financial advisors or, in Executive's case, members of Executive's immediate family or, in the Company's case, for any reasonable purpose that is reasonably related to its business operations; provided, that this Section 8.6 shall not be construed to prohibit any disclosure required by law or in any proceeding to enforce the terms and conditions of this Agreement.

#642131 v2 \19047 \001

9.      **Certain Acknowledgments; Injunctive Relief with Respect to Covenants**

9.1     *Certain Acknowledgements.*  Executive acknowledges and agrees that Executive will have a prominent role in the development of the goodwill of the Company and its affiliates, and has and will establish and develop relations and contacts with the principal business relationships of the Company and its affiliates in the United States of America and the rest of the world, all of which constitute valuable goodwill of, and could be used by Executive to compete unfairly with, the Company and its affiliates and that (a) the covenants and restrictions contained in Section 8 are intended to protect the legitimate interests of the Company and its affiliates in their respective goodwill, trade secrets and other confidential and proprietary information; and (b) Executive desires to be bound by such covenants and restrictions.

9.2     *Injunctive Relief.*  Executive acknowledges and agrees that the covenants, obligations and agreements of Executive contained in Section 8 relate to special, unique and extraordinary matters and that a violation of any of the terms of such covenants, obligations or agreements will cause the Company and its affiliates irreparable injury for which adequate remedies are not available at law.  Therefore, Executive agrees that the Company shall be entitled to an injunction, restraining order or such other equitable relief (without the requirement to post bond) as a court of competent jurisdiction may deem necessary or appropriate to restrain Executive from committing any violation of such covenants, obligations or agreements.  These injunctive remedies are cumulative and in addition to any other rights and remedies the Company and its affiliates may have.

10.     **Entire Agreement**

This Agreement constitutes the entire agreement among the Company and Executive with respect to the subject matter hereof, and supersedes all undertakings and agreements, whether oral or in writing, previously entered into by the Company and Executive with respect thereto.  All prior correspondence and proposals (including, but not limited to, summaries of proposed terms) and all prior offer letters, promises, representations, understandings, arrangements and agreements relating to such subject matter (including, but not limited to, those made to or with Executive by any other person) are merged herein and superseded hereby.

11.     **Miscellaneous**

11.1    *Binding Effect; Assignment.*  This Agreement shall be binding on and inure to the benefit of the Company and its respective successors and permitted assigns.  This Agreement shall also be binding on and inure to the benefit of Executive and Executive's heirs, executors, administrators and legal representatives.  This Agreement shall not be assignable by any party hereto without the prior written consent of the other parties hereto, except as provided pursuant

to this Section 11.1. The Company may effect such an assignment without prior written approval of Executive upon the transfer of all or substantially all of its business and/or assets (by whatever means).

    11.2    *Governing Law; Waiver of Jury Trial.*

        11.2.1 *Governing Law; Consent to Jurisdiction.* This Agreement shall be governed in all respects, including as to interpretation, substantive effect and enforceability, by the internal laws of the State of Illinois, without regard to conflicts of laws provisions thereof that would require application to the laws of another jurisdiction other than those that mandatorily apply. Each party hereby irrevocably submits to the jurisdiction of the courts of the State of Illinois and the federal courts of the United States of America located in Cook County solely in respect of the interpretation and enforcement of the provisions of this Agreement and in respect of the transactions contemplated hereby. Each party hereby waives and agrees not to assert, as a defense in any action, suit or proceeding for the interpretation and enforcement hereof, or in respect of any such transaction, that such action, suit or proceeding may not be brought or is not maintainable in such courts or that the venue thereof may not be appropriate or that this Agreement may not be enforced in or by such courts. Each party hereby consents to and grants any such court jurisdiction over the person of such parties and over the subject matter of any such dispute and agree that the mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 11.6 or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

        11.2.2 *Waiver of Jury Trial.* Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect or any litigation directly or indirectly arising out of or relating to this Agreement, or the breach, termination or validity of this Agreement, or the transactions contemplated by this Agreement. Each party certifies and acknowledges that (<u>a</u>) no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver; (<u>b</u>) each such party understands and has considered the implications of this waiver; (<u>c</u>) each such party makes this waiver voluntarily; and (*d*) each such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 11.2.2.

    11.3    *Taxes.* All amounts payable hereunder shall be subject to any and all applicable taxes, as required by applicable Federal, state, local and foreign laws and regulations.

#642131 v2 \19047 \001

11.4 *Amendments; Waiver.* No provision of this Agreement may be modified, waived or discharged unless such modification, waiver or discharge is approved by the a Person authorized by the Company and is agreed to in writing by Executive and, in the case of any such modification, waiver or discharge affecting the rights or obligations of the Company, is approved by a Person authorized thereby. No waiver by any party hereto at any time of any breach by any other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No waiver of any provision of this Agreement shall be implied from any course of dealing between or among the parties hereto or from any failure by any party hereto to assert its rights hereunder on any occasion or series of occasions.

11.5 *Severability; Blue Pencil.* In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby. Executive and the Company agree that the covenants contained in Section 8 hereof are reasonable covenants under the circumstances, and further agree that if, in the opinion of any court of competent jurisdiction such covenants are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of these covenants as to the court shall appear not reasonable and to enforce the remainder of these covenants as so amended.

11.6 *Notices.* Any notice or other communication required or permitted to be delivered under this Agreement shall be (a) in writing; (b) delivered personally, by facsimile, by electronic mail, by courier service or by certified or registered mail, first class postage prepaid and return receipt requested; (c) deemed to have been received on the date of delivery or, if so mailed, on the third business day after the mailing thereof; and (d) addressed as follows (or to such other address as the party entitled to notice shall hereafter designate in accordance with the terms hereof):

    (i)  If to the Company:

      Hi-Tide Media, LLC
      211 E. Grand Avenue
      Chicago, IL 60611
      Attention: Chief Executive Officer
      Tel: (312) 670-2381
      Fax: (646) 349-1124
      Email: mkako@hitidemedia.com

#642131 v2\19047\001

　　　　　　　　　　　　(ii)　If to Executive, at Executive's residential address as currently on file with the Company.

　　11.7　*Survival*.  The Company and Executive hereby agree that certain provisions of this Agreement, including, but not limited to, Sections 8, 9, 10 and 11, shall survive the expiration of the Employment Period in accordance with their terms.

　　11.8　*Further Assurances*.  Each party hereto agrees with the other party hereto that it will cooperate with such other party and will execute and deliver, or cause to be executed and delivered, all such other instruments and documents, and will take such other actions, as such other parties may reasonably request from time to time to effectuate the provisions and purpose of this Agreement.

　　11.9　*Counterparts*.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  The parties hereto agree to accept a signed facsimile copy of this Agreement as a fully binding original.

　　11.10　*Headings*.  The section and other headings contained in this Agreement are for the convenience of the parties only and are not intended to be a part hereof or to affect the meaning or interpretation hereof.

　　　　　　　　　　-- Signature page follows --

IN WITNESS WHEREOF, the Company has duly executed this Agreement by their authorized representatives, and Executive has hereunto set Executive's hand, in each case effective as of the date first above written.

        Hi-Tide Media, LLC

        By: _____
        Name: Michael Kakoyiannis
        Title: President/CEO

        Executive

        _____
        Name:  Chris Derylo

## SCHEDULE "A"

Michael Walters Advertising
& Wojdyla Advertising
Bill Youmans
BCA Advertising
Steve Mandel
Coil, Counts, Ford & Cheney
Al Schmidt
Manga Entertainment
LRSmedia
Mike Egan
Marvin Gleicher
Rick Leslie
Victoria Cokee
Tracy Heropkie
RL Agency
Carole Burke Hallberg
Kalei Beamon
Subliminal Pictures
Darryl Miller
Michelle Miller

#642131 v2 \19047 \001